UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Minnesota Vikings Football Stadium, LLC,     Civil No. 15-4502 (DWF/JSM)
a Delaware limited liability company,

            Plaintiff,

v.                                                       **MEMORANDUM**
                                                     **OPINION AND ORDER**

Wells Fargo Bank, National Association, a
national banking association,

            Defendant.
_____

Kevin R. Coan, Esq., Lewis J. Rotman, Esq., and Margaret Ann Santos, Esq., Hinshaw & Culbertson LLP, counsel for Plaintiff.

Bryan R. Freeman, Esq., and Christopher R. Grote, Esq., Lindquist & Vennum LLP, counsel for Defendant.
_____

# INTRODUCTION

Plaintiff Minnesota Vikings Football Stadium, LLC ("MVFS") is involved in the construction and promotion of U.S. Bank Stadium (the "Stadium"), the future home of the Minnesota Vikings, a team in the National Football League ("NFL"). The Stadium, which is currently under construction, is located in the Downtown East area of Minneapolis. Defendant Wells Fargo Bank, National Association ("Wells Fargo") is a national bank that owns two 17-story office towers (the "Wells Fargo Towers") that, like the Stadium, are currently under construction and located in Downtown East. In this action, MVFS claims that Wells Fargo breached its contract with MVFS by installing

mounted and illuminated signs on the roof-tops of the Wells Fargo Towers when the parties' contract allows only non-mounted, non-illuminated roof-top signs.[1]

This matter is before the Court on MVFS's Motion for Mandatory Preliminary Injunction (Doc. No. 10). MVFS asks the Court to require Wells Fargo to disassemble or cover the roof-top signs on the Wells Fargo Towers. For the reasons stated below, MVFS's motion is denied.

## BACKGROUND

In 2012, the Minnesota legislature enacted Minn. Stat. §§ 473J.01-473J.27 (the "Stadium Legislation") "to provide for the construction, financing, and long-term use" of the Stadium. Minn. Stat. § 473J.01; *see also* 2012 Minn. Sess. Law Serv. Ch. 299 (H.F. 2958) (West). The Stadium Legislation established the Minnesota Sports Facilities Authority ("MSFA"), a public body consisting of three members appointed by the Governor of Minnesota and two members appointed by the Mayor of Minneapolis. Minn. Stat. § 473J.07. MSFA and MVFS entered into a Stadium Use Agreement and a Stadium Development Agreement. (Doc. No. 15 ("Becker Decl.") ¶¶ 2-3.) The Stadium Use Agreement gave MVFS the right to control the branding and image of the Stadium. (*Id.* ¶ 2, Ex. 1.) The Stadium Development Agreement established a Stadium Design and

---

[1] At oral argument, counsel for MVFS clarified that Wells Fargo's signs are not illuminated at this time but maintained that mounted roof-top signs, even without illumination, violate the parties' contract. The illumination or non-illumination of the roof-top signs does not change the Court's analysis. However, for purposes of this motion, the Court assumes that Wells Fargo intends to illuminate the roof-top signs and that MVFS objects to such illumination.

Construction Group, which included representatives from both MSFA and MVFS, and gave it responsibility for the Stadium's design and construction. (*Id.* ¶ 3, Ex. 2.)

After the enactment of the Stadium Legislation, Wells Fargo partnered with Ryan Companies ("Ryan") and the City of Minneapolis (the "City") on a Downtown East mixed-use redevelopment project. (Doc. No. 23 ("Hanson Decl.") ¶¶ 3-4.) The project includes construction of the Wells Fargo Towers, which will house offices for over 5,000 Wells Fargo employees. (*Id.* ¶ 4.) On November 12, 2013, the Minneapolis City Planning Commission approved Ryan's design for the Wells Fargo Towers. (Becker Decl. ¶¶ 5-6, Exs. 3-4.)

On February 10, 2014, MVFS and Wells Fargo entered into an Agreement Regarding Signage (the "Signage Agreement"), which relates to the exterior signs that Wells Fargo may install on the Wells Fargo Towers. (*Id.* ¶ 9, Ex. 6 ("Signage Agreement").) The Signage Agreement states, in relevant part:

> 1. <u>Signage Restrictions</u>. The following types of exterior signs . . . are prohibited on the [Wells Fargo Towers]:
>
> (a) roof-mounted or roof-applied signs of any kind other than (i) those depicted in terms of image, location, scale, size (56' x 56') and utility on the attached Downtown East Master Signage Plan Revision dated January 22, 2014 and attached as <u>Exhibit D</u> (the "**Master Signage Plan**"); provided that roof top signs of the same image and in the same location as the 56' x 56' signs depicted on the Master Signage Plan may be smaller in size, scale and utility.

(Signage Agreement ¶ 1(a).) Exhibit D, the Master Signage Plan, is a sixteen-page document with multiple diagrams showing exterior signs on the Wells Fargo Towers. (*Id.*, Ex. D) The diagram at issue shows one 56-foot by 56-foot sign on each of the two

Towers.  (*Id.*, Ex. D at D-9.)  It includes the following text:  "**Non-Mounted Skyview Graphic (Qty. 2)** Painted Roof Sign, Custom."  (*Id.*)  The Master Signage Plan also includes plans for, among other signs, four 58-foot by 5-foot illuminated signs near the top of four faces of the Wells Fargo Towers.  (*Id.*, Ex. D at D-4, D-8.)  Only the roof-top signs are disputed in this lawsuit.

At the time the parties entered into the Signage Agreement, the City of Minneapolis Sign Ordinance prohibited certain roof-top signs, including the signs that Wells Fargo sought to install on the Wells Fargo Towers.  (Hanson Decl. ¶ 9.)  In this context, MVFS agreed that it would:

> discontinue opposition to and w[ould] not oppose Wells Fargo's efforts now or in the future to obtain approval from the City of Minneapolis for the Roof Top signs, wall mounted signs and ground mounted monuments depicted in terms of image, location, scale, size (or smaller) and utility on the Master Signage Plan, or substitute signage in conformance with this Agreement.

(Signage Agreement ¶ 2.)  The parties also agreed that violation of the Signage Agreement, by either party, would cause irreparable harm:

> 5.   Remedies.  The parties acknowledge and agree that if Wells Fargo . . . or if [MVFS] . . . fails to observe one or more of the restrictions set forth in this Agreement or fails to perform one or more of the covenants to which such person or entity is subject . . . the persons or entities benefited by the covenant or restriction would suffer irreparable harm for which a recovery of money damages would not be an inadequate [sic] remedy.

(*Id.* ¶ 5.)  In the same provision, the parties agreed that a person or entity benefitting from the Signage Agreement's restrictions could file a lawsuit seeking temporary or permanent injunctive relief.  (*Id.*)

4

In early 2014, Wells Fargo promoted an amendment to the City of Minneapolis Sign Ordinance that would permit the roof-top signs that Wells Fargo wanted to install on the Wells Fargo Towers. (Hanson Decl. ¶ 9, Ex. A.) MVFS did not oppose the amendment, and on March 28, 2014, the Minneapolis City Council passed it.[2] (*Id.* ¶ 10; *see also* Doc. No. 12 ("Pl.'s Memo") at 9.)

On August 8, 2014, Wells Fargo presented MVFS with a document depicting Wells Fargo's plan for signs on the Wells Fargo Towers (the "Proposed Signage Document"). (Becker Decl. ¶ 16, Ex. 12.) Like the Master Signage Plan attached to the Signage Agreement, the Proposed Signage Document shows one 56-foot by 56-foot roof-top sign on each of the two Wells Fargo Towers. (*See id.* at 8.) Unlike the Master Signage Plan, the Proposed Signage Document includes details about the construction of signs on the Wells Fargo Towers, including that the roof-top signs will feature illuminated lettering, mounted on I-beams, on a painted background. (*See id.* at 17-18.) On August 13, 2014, MVFS sent a letter to Wells Fargo stating its position that the Signage Agreement did not permit Wells Fargo to install the mounted, illuminated roof-top signs featured in the Proposed Signage Document. (Becker Decl. ¶ 18, Ex. 13.)

Nonetheless, Wells Fargo indicated its intention to install roof-top signs with mounted, illuminated lettering on at least three occasions. On March 13, 2015, in a

---

[2] The City of Minneapolis Sign Ordinance, as amended, permits "[r]oof signs identifying the name or logo of a building or use, affixed flat on the roof and viewed from above," subject to certain restrictions. Minneapolis Code of Ordinances § 543.425(c). The amended Ordinance permits roof-top signs that are "non-illuminated or externally illuminated in such a way that the light shall be aimed and shielded directly onto the roof sign only." *Id.*

phone conversation with MVFS, Wells Fargo acknowledged that the Proposed Signage Document included roof-tops signs with mounted, illuminated lettering.  (*Id.* ¶ 19.)  In the same month, MVFS learned from MSFA that Wells Fargo had submitted the sign plans shown in the Proposed Signage Document to the City and that the plans met "all of the City's requirements."[3]  (*Id.* ¶ 20.)  Finally, on June 23, 2015, in a meeting with MVFS, Wells Fargo indicated its intent to proceed with the roof-top signs in the Proposed Signage Document.  (*Id.* ¶ 21.)  Indeed, Wells Fargo began installing signs on the Wells Fargo Towers in April 2015.  (Doc. No. 24 ("Hailey Decl.") ¶ 3.)

The Stadium, which is currently under construction, is scheduled to open in August 2016.  (*See* Doc. No. 21 ("Def.'s Memo") at 1-2, 24.)  Although the Stadium is not yet in use, television broadcasts of NFL games have shown aerial photography of the Stadium and surrounding area, including the Wells Fargo Towers.  (Doc. No. 16 ("Anderson Decl.") ¶ 2, Ex. 1.)  In addition, images of the Stadium and the Wells Fargo Towers are available to the public through an internet "webcam" showing the Stadium's construction over time.  (*See, e.g.*, Doc. No. 14 ("Coan Decl.") ¶¶ 2-6, 8-9, Exs. 1-5, 7-8.)

On December 18, 2015, according to MVFS, Wells Fargo finally confirmed its intention to proceed with the mounted, illuminated roof-top signs.  (*See* Pl.'s Memo at 14.)  On that day, the signs were "first visibly demonstrated" to MVFS in photographs from the Stadium construction webcam.  (*Id.*; *see also* Coan Decl. ¶ 3, Ex. 2.)  On December 22, 2015, MVFS filed this action against Wells Fargo in Hennepin County

---

[3]     The City, without objection, approved Wells Fargo's plans for roof-top signage on the Wells Fargo Towers.  (Hanson Decl. ¶ 11.)

District Court, alleging that Wells Fargo breached the Signage Agreement and requesting declaratory and injunctive relief.  (Doc. No. 1, Ex. A.)  At the same time, it moved for a temporary injunction to prevent Wells Fargo from installing or maintaining mounted or illuminated roof-top signs on the Wells Fargo Towers.  (Doc. No. 1, Ex. B.)  On December 24, 2015, Wells Fargo removed the case to this Court.  (Doc. No. 1.)  On December 29, 2015, MVFS filed the instant Motion for Mandatory Preliminary Injunction.  (Doc. No. 10.)

## DISCUSSION

### I. Standard of Review

The Court considers four factors in determining whether to grant a preliminary injunction:  (1) the threat of irreparable harm to the moving party; (2) the balance between this harm and the injury that granting the injunction would inflict on the non-moving party; (3) the moving party's likelihood of success on the merits; and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc*., 640 F.2d 109, 113 (8th Cir. 1981).  "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  *Id.*  A preliminary injunction is an "extraordinary remedy," and the moving party bears the burden of establishing the need for a preliminary injunction.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

### II. Irreparable Harm

To begin, the Court considers whether MVFS is likely to suffer irreparable harm if the Court denies its motion.  "Irreparable harm occurs when a party has no adequate

remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Speculative injury is insufficient to justify a preliminary injunction, and a moving party's long delay after learning of the threatened harm may indicate that the harm is neither great nor imminent. *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894-95 (8th Cir. 2013); *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 603 (8th Cir. 1999). The moving party's failure to show irreparable harm absent an injunction is sufficient to warrant denial of a request for preliminary injunctive relief. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987).

According to MVFS, Wells Fargo's mounted and illuminated roof-top signs will result in irreparable harm to MVFS because the signs distract from the image of the Stadium. Specifically, viewers of televised NFL games and users of the Stadium construction webcam will see Wells Fargo's signs when they see images of the Stadium. As such, in MVFS's view, Wells Fargo's signs encroach on MVFS's "rights to that image [of the Stadium], which, once done, cannot be undone." (Pl.'s Memo at 25.)

While the Court acknowledges that harm to the Stadium's "image" may be difficult to measure in terms of monetary damages, the Court finds that any harm suffered by MVFS is speculative. The parties agree that Wells Fargo is permitted to have certain signs that will appear in images of the Stadium. Namely, the parties do not dispute that Wells Fargo may install two non-mounted, non-illuminated roof-top signs, and they do not dispute that Wells Fargo's other signs—including the four 58-foot by 5-foot illuminated signs, near the top of the Wells Fargo Towers—are allowed. Indeed, Wells

Fargo's 58-foot by 5-foot signs are visible in the majority of the webcam photographs submitted by the parties for the purpose of showing the roof-top signs. Given these indisputably permissible signs, the effect of mounted, illuminated roof-top signs on the Stadium's "image" is minimal.[4]

Further, the fact that MVFS waited until December 22, 2015 to seek preliminary injunctive relief undermines its claim of irreparable harm. MVFS received Wells Fargo's Proposed Signage Document, featuring mounted, illuminated roof-top signs, in August 2014—more than a year before MVFS filed the instant motion. And, MVFS points to occasions in March and June of 2015, when Wells Fargo affirmatively indicated to MVFS that it intended to install the mounted, illuminated roof-top signs featured in the Document. Still, MVFS did not seek preliminary injunctive relief until months later.

Finally, the parties' contractual agreement that violation of the Signage Agreement by Wells Fargo would cause irreparable harm to MVFS does not bind this Court. The irreparable-harm provision of the Signage Agreement "lend[s] weight" to MVFS's position because it shows "that the parties contemplated that a breach of the [Signage Agreement] could cause irreparable harm."[5] *See Allan Block Corp. v. E. Dillon & Co.*, Civ. No. 04-3511, 2005 WL 1593010, at *6 (D. Minn. July 1, 2005). However, an

---

[4] Wells Fargo maintains that MVFS's theory of the roof-top sign's harm to MVFS "strains credibility," (Def.'s Memo at 16), while simultaneously claiming that the roof-top signs are so important to Wells Fargo that MVFS's opposition to the signs "nearly scuttled the Downtown East redevelopment project," (*id.* at 4). Although the Court questions the consistency of Wells Fargo's position, it nonetheless concludes that MVFS has not established irreparable harm in this case.

[5] At oral argument, however, neither party could articulate precisely what the parties intended when they agreed to the irreparable harm provision.

irreparable-harm provision, without more, is insufficient to establish irreparable harm. *Id.*; *see also Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004); *Leggett & Platt, Inc. v. Fleetwood Indus., Inc.*, Civ. No. 15-5064, 2015 WL 4160401, at *3 (W.D. Mo. July 9, 2015). Given the evidence in the record, the Court concludes that MVFS has not demonstrated that it will suffer irreparable harm if the Court does not enter the injunction that MVFS requests. The irreparable-harm factor weighs in favor of Wells Fargo.

### III.   Balance of Harms

Next, the Court considers whether the harm that MVFS would suffer if the Court denies its motion outweighs the harm that Wells Fargo would suffer if the Court grants the motion. *See, e.g.*, *Gen. Motors*, 563 F.3d at 320. At oral argument, MVFS asked the Court to order Wells Fargo to disassemble, or alternatively cover, the roof-top signs on the Wells Fargo Towers. The problem with MVFS's request, however, is that MVFS concedes that the Signage Agreement entitles Wells Fargo to two non-mounted, non-illuminated 56-foot by 56-foot roof-top signs. Requiring Wells Fargo to disassemble or cover the existing signs would leave Wells Fargo with no roof-top signs at all.[6] Moreover, forcing Wells Fargo to disassemble its signs would likely cause harm to Wells Fargo in the form of additional labor and storage expenses, as well as disruption of

---

[6]   The Court recognizes that if Wells Fargo were forced to disassemble or cover its roof-top signs, the Wells Fargo Towers would still have other exterior signs, including the four 58-foot by 5-foot illuminated signs near the top of the Towers. Notwithstanding the presence of these undisputed signs, the parties agree that the Signage Agreement entitles Wells Fargo to some form of roof-top signage.

construction plans.[7]  Because MVFS fails to establish that it will suffer irreparable harm if the Court does not grant its motion, the balance of harms tips in Wells Fargo's favor.

## IV.  Likelihood of Success on the Merits

In addition to considering the harms MVFS and Wells Fargo may suffer, the Court assesses MVFS's likelihood of succeeding on the merits of its claims.  In the Eighth Circuit, the likelihood-of-success factor is the most important of the four *Dataphase* factors.  *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013).  The moving party need not "prove a greater than fifty per cent likelihood that [it] will prevail on the merits," *Dataphase*, 640 F.2d at 113, but rather must demonstrate a "fair chance of prevailing," *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).

MVFS claims that Wells Fargo breached the parties' Signage Agreement.  To succeed on the merits of this claim, MVFS must prove that:  (1) MVFS and Wells Fargo formed a valid contract; (2) MVFS performed any conditions precedent to its right to demand Wells Fargo's performance under the contract; and (3) Wells Fargo breached the parties' contract.  *See Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014).  Here, the parties do not dispute that the Signage Agreement is valid and enforceable, and they do not dispute that MVFS, per the Agreement, did not oppose Wells Fargo's efforts to obtain approval for the exterior signs shown in the Master

---

[7]  As indicated at oral argument, the Court believes that, for the purposes of MVFS's motion, covering Wells Fargo's roof-top signs with a tarp would accomplish the same ends as disassembling the signs.  Covering the signs, however, would impose a smaller burden on Wells Fargo.  Regardless of whether MVFS requests an injunction ordering Wells Fargo to disassemble the signs or cover the signs, the balance-of-harms factor weighs in favor of Wells Fargo.

Signage Plan. Further, they do not dispute that Wells Fargo has installed two mounted roof-top signs.

The contested issue is whether the Signage Agreement permits Wells Fargo's roof-top signs. Under Minnesota law, a court interpreting a contract (such as the Signage Agreement) must attempt to determine the intent of the parties from the language of the contract in light of all of the contract's terms. *Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 793 (8th Cir. 2014); *Residential Funding Co., LLC v. Terrace Mortg. Co.*, 725 F.3d 910, 916 (8th Cir. 2013). If the court determines that the contract language is unambiguous—meaning it has only one reasonable interpretation—it will give effect to that language. *Seagate Tech., LLC v. W. Dig. Corp.*, 854 N.W.2d 750, 761 (Minn. 2014). If, however, the court concludes that the contract language is ambiguous, evidence outside the language of the contract, including the circumstances surrounding the contract's formation, is used to determine the parties' intent. *Metro. Airports Comm'n v. Noble*, 763 N.W.2d 639, 645-46 (Minn. 2009).

Here, the operative contract provision prohibits Wells Fargo from installing "roof-mounted or roof-applied signs of any kind other than (i) those depicted in terms of image, location, scale, size (56' x 56') and utility" in the Master Signage Plan. The Master Signage Plan includes a diagram showing a 56-foot by 56-foot roof-top sign on each of the two Wells Fargo Towers. That diagram includes the following text: "**Non-Mounted Skyview Graphic (Qty. 2)** Painted Roof Sign, Custom."

MVFS argues that Wells Fargo's roof-top signs clearly violate the parties' contract. (Pl.'s Memo at 29-31.) According to MVFS, the language of the Signage

Agreement unambiguously demonstrates the parties' intent to allow *only* non-mounted, painted signs as shown in the Master Signage Plan's diagram. (*Id.*) Further, because the diagram does not provide that the signs are illuminated, MVFS concludes that Wells Fargo may not illuminate the roof-top signs in any way. (*Id.* at 31 n.13.)

Wells Fargo contends that the Signage Agreement is not nearly as simple as MVFS suggests. (Def.'s Memo at 26-35.) According to Wells Fargo, the Signage Agreement's silence regarding illumination of the roof-top signs shows that the parties did not intend to prohibit illumination; if they had, they would have done so expressly. (*Id.* at 27-31.) Moreover, Wells Fargo argues that the Signage Agreement demonstrates the parties' intent to establish general guidelines regarding the "image, location, scale, size (56' x 56') and utility" of Wells Fargo's roof-top signs, without binding Wells Fargo to the specific details of the signs shown in the roof-top diagram. (*Id.* at 32.) General guidelines made sense, Wells Fargo contends, because at the time the parties entered into the Signage Agreement, construction on the Wells Fargo Towers had not yet begun. (*Id.*) Finally, Wells Fargo claims that its mounted, illuminated roof-top signs are consistent with the Signage Agreement, because the roof-top diagram and the current roof-top signs show the same red and gold Wells Fargo "image." (*Id.* at 32-33.) Thus, for Wells Fargo, the roof-top signs are "roof-mounted or roof-applied signs" of the same kind as "those depicted in terms of image, location, scale, size (56' x 56') and utility" in the Master Signage Plan. (*Id.*)

At this early stage of litigation, the Court concludes that both parties have viable arguments. As such, without finding that MVFS's argument is stronger than Wells

Fargo's argument, the Court determines that MVFS's breach-of-contract claim has a "fair chance of prevailing," which is enough for the likelihood-of-success factor to weigh in favor of MVFS.

## V.     Public Interest

Finally, the Court considers whether any public policy considerations bear on whether the Court should grant or deny MVFS's motion.  *See, e.g.*, *Chlorine Inst. Inc. v. Soo Line R.R.*, 792 F.3d 903, 916 (8th Cir. 2015).  The fact that public and private entities have collaborated on the Stadium and the development of the surrounding Downtown East area, including the Wells Fargo Towers, does not escape the Court.  The Stadium is a community asset intended to benefit the public, and public money constitutes a significant portion of the Stadium's funding.  At the same time, the development of the area surrounding the Stadium, including the Wells Fargo Towers, involves public-private collaboration and will presumably bring housing, jobs, and infrastructure to Downtown East.  Indeed, with each party touting the public benefits that its respective investment in Downtown East will provide, it is difficult for the Court to understand why the parties, with or without the involvement of the City, could not reach an agreement—for the benefit of the public—on the meaning and effect of the Signage Agreement.  The Court finds that the public interest weighs neither for nor against MVFS's motion.

## CONCLUSION

Although MVFS has demonstrated a fair chance of prevailing on its breach-of-contract claim, it has not demonstrated that the injunction it seeks is necessary to prevent it from suffering irreparable harm.  Further, even though the Wells Fargo Towers feature

several exterior signs that are not in dispute, granting MVFS's motion is likely to cause harm to Wells Fargo (albeit minor harm) by temporarily depriving it of all roof-top signs, including non-mounted, non-illuminated roof-top signs. In these circumstances, the Court denies MVFS's request for preliminary injunctive relief.

## ORDER

Based on the files, records, and proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1. Minnesota Vikings Football Stadium, LLC's Motion for Mandatory Preliminary Injunction (Doc. No. [10]) is **DENIED**.

2. The parties shall contact the Magistrate Judge to set an expedited schedule, including dates for trial and one or more settlement conferences. As noted at oral argument, the Court will give the case calendar priority.


Dated:  January 28, 2016               s/Donovan W. Frank
                                       DONOVAN W. FRANK
                                       United States District Judge