## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Minnesota Vikings Football Stadium, LLC,           Civil No. 15-4502 (DWF/JSM)
a Delaware limited liability company,

                    Plaintiff,

v.                                                          **MEMORANDUM**
                                                      **OPINION AND ORDER**

Wells Fargo Bank, National Association,
a national banking association,

                    Defendant.
_____

Kevin R. Coan, Esq., Lewis J. Rotman, Esq., and Margaret Ann Santos, Esq., Hinshaw & Culbertson LLP, counsel for Plaintiff.

Bryan R. Freeman, Esq., Christopher R. Grote, Esq., and Mark S. Enslin, Esq., Lindquist & Vennum LLP, counsel for Defendant.
_____

## INTRODUCTION

Plaintiff Minnesota Vikings Football Stadium, LLC ("MVFS") sued Defendant

Wells Fargo Bank, National Association ("Wells Fargo") after Wells Fargo began

installing roof-top signs on two 17-story office towers (the "Wells Fargo Towers")

located next to U.S. Bank Stadium (the "Stadium") in Minneapolis.  MVFS claims that

Wells Fargo's mounted and illuminated[1] roof-top signs violate the parties' contract,

which permits only flat, painted roof-top signs.  Asserting that Wells Fargo's roof-top

---

[1]     The roof-top signs currently installed on the Wells Fargo Towers have lights and wiring that, when activated, will artificially illuminate the signs.  Although the signs are not currently turned on, the Court refers to the signs as "illuminated" for the sake of simplicity, as well as for consistency with the language used by the parties in their briefing.

signs adversely affect the Stadium's "image," MVFS seeks a permanent injunction requiring Wells Fargo to remove the signs and prohibiting Wells Fargo from installing or maintaining any other mounted or illuminated roof-top signs on the Wells Fargo Towers. MVFS also seeks an order rescinding Wells Fargo's rights to install any roof-top signage of any kind, and it seeks attorneys' fees and costs.

Nearly five months ago, the Court denied MVFS's motion for a preliminary injunction requiring Wells Fargo to disassemble or cover the roof-top signs that it was in the process of installing on the Wells Fargo Towers. One basis for that decision was the speculative nature of the injury MVFS claimed it would suffer if the Court did not enjoin Wells Fargo prior to deciding the merits of the case. Now, Wells Fargo has completed the installation of the roof-top signs, and the parties have completed discovery and submitted cross-motions for summary judgment.

Considering the evidence and arguments of counsel, the Court holds that because the parties' contract unambiguously prohibits the roof-top signs that Wells Fargo has installed on the Wells Fargo Towers, Wells Fargo is liable for breach of contract. Further, the balance of equities supports a permanent injunction requiring Wells Fargo to remove its current roof-top signs and prohibiting Wells Fargo from installing or maintaining any other mounted or illuminated roof-top signs. The Court finds no basis for an order rescinding Wells Fargo's contractual rights to install non-mounted, non-illuminated roof-top signs. Still, MVFS is the prevailing party and, pursuant to the parties' contract, is entitled to attorneys' fees and costs.

2

# BACKGROUND[2]

## I.      The Stadium and the Wells Fargo Towers

In 2012, the Minnesota legislature enacted Minn. Stat. §§ 473J.01-473J.27 (the "Stadium Legislation") "to provide for the construction, financing, and long-term use" of the Stadium, the future home of the Minnesota Vikings, a football team in the National Football League.  Minn. Stat. § 473J.01; *see also* 2012 Minn. Sess. Law Serv. Ch. 299 (H.F. 2958) (West).  The Stadium Legislation established the Minnesota Sports Facilities Authority ("MSFA"), a public body consisting of three members appointed by the Governor of Minnesota and two members appointed by the Mayor of Minneapolis. Minn. Stat. § 473J.07.  MSFA and MVFS are parties to a Stadium Use Agreement and a Stadium Development Agreement.  (Doc. No. 15 ("Becker Decl.") ¶¶ 2-3.)  The Stadium Use Agreement gives MVFS the right to control the branding and image of the Stadium. (*Id.* ¶ 2, Ex. 1 at Arts. 11, 23; *see also* Doc. No. 47 ("Coan Decl.") ¶ 5, Ex. D ("Hanson Dep.") at 31-32.)  The Stadium Development Agreement establishes a Stadium Design and Construction Group, which includes representatives from both MSFA and MVFS, and gives it responsibility for the Stadium's design and construction.  (Becker Decl. ¶ 3, Ex. 2.)

After the enactment of the Stadium Legislation, Wells Fargo partnered with Ryan Companies ("Ryan") and the City of Minneapolis (the "City") on a redevelopment project in Downtown East, the neighborhood where the Stadium is located.  (Doc. No. 23

---

[2]      This "Background" section reiterates, in large part, the "Background" section included in the Court's January 28, 2016 Memorandum Opinion and Order denying MVFS's motion for a preliminary injunction (Doc. No. 28).

("Hanson Decl.") ¶¶ 3-4.)  The project includes construction of the Wells Fargo Towers, which will house offices for over 5,000 Wells Fargo employees.  (*Id.* ¶ 4.)  On November 12, 2013, the Minneapolis City Planning Commission approved Ryan's design for the Wells Fargo Towers.  (Becker Decl. ¶¶ 5-6, Exs. 3-4.)

## II.    The Signage Agreement

On February 10, 2014, MVFS and Wells Fargo entered into an Agreement Regarding Signage (the "Signage Agreement"), which relates to the exterior signs that Wells Fargo may install on the Wells Fargo Towers.  (*Id.* ¶ 9, Ex. 6 ("Signage Agreement").)  Three provisions of the Signage Agreement are of particular relevance to this case:

First, paragraph 1(a) restricts the roof-top signs that Wells Fargo may install and maintain on the Wells Fargo Towers:

> 1.    <u>Signage Restrictions</u>.  The following types of exterior signs . . . are prohibited on the [Wells Fargo Towers]:
>
> (a) roof-mounted or roof-applied signs of any kind other than (i) those depicted in terms of image, location, scale, size (56' x 56') and utility on the attached Downtown East Master Signage Plan Revision dated January 22, 2014 and attached as <u>Exhibit D</u> (the "**Master Signage Plan**"); provided that roof top signs of the same image and in the same location as the 56' x 56' signs depicted on the Master Signage Plan may be smaller in size, scale and utility.

(Signage Agreement ¶ 1(a).)  The Master Signage Plan, attached as Exhibit D to the Signage Agreement, is a sixteen-page document with multiple diagrams showing exterior signs on the Wells Fargo Towers.  (Signage Agreement, Ex. D ("Master Signage Plan").)  One of these diagrams shows roof-top signs.  (Master Signage Plan at D-9.)  According

4

to the diagram, each sign is identical to the other and features yellow letters spelling

"Wells Fargo" on a red background measuring 56 feet in height and 56 feet in width.

(*Id.*)  The diagram shows the signs' location and orientation on the roofs of the two Wells

Fargo Towers, and it includes the following text:

> **Non-Mounted Skyview Graphic (Qty. 2)**
> Painted Roof Sign, Custom
> Additional street level signage to be further defined at a later date.

(*Id.*)  The diagram also appears to represent the Wells Fargo Towers in daylight and does

not address illumination of the roof-top signs.  (*Id.*)

Second, paragraph 2 states MVFS's promise to refrain from interfering with Wells

Fargo's efforts to gain approval for its signs from the City of Minneapolis:

> 2.    Covenants of [MVFS].  [MVFS] and its Affiliates will discontinue
> opposition to and will not oppose Wells Fargo's efforts now or in the future
> to obtain approval from the City of Minneapolis for the Roof Top signs,
> wall mounted signs and ground mounted monuments depicted in terms of
> image, location, scale, size (or smaller) and utility on the Master Signage
> Plan, or substitute signage in conformance with this Agreement.

(Signage Agreement ¶ 2.)  At the time the parties entered into the Signage Agreement,

the City of Minneapolis Sign Ordinance prohibited most roof-top signs, including the

signs that Wells Fargo sought to install on the Wells Fargo Towers.  (Hanson Decl. ¶ 9.)

Third, paragraph 5 provides that violation of the Signage Agreement, by either

party, will cause irreparable harm:

> 5.    Remedies.  The parties acknowledge and agree that if Wells Fargo
> . . . or if [MVFS] . . . fails to observe one or more of the restrictions set
> forth in this Agreement or fails to perform one or more of the covenants to
> which such person or entity is subject . . . the persons or entities benefited
> by the covenant or restriction would suffer irreparable harm for which a
> recovery of money damages would not be an inadequate [sic] remedy.

(Signage Agreement ¶ 5.)  In paragraph 5, the parties also agree that the "prevailing party" in an action to enforce the Signage Agreement "shall be entitled to collect all of its reasonable costs of the action, including reasonable attorneys' fees, from the non-prevailing party."  (*Id.*)

### III.    Wells Fargo's Roof-top Signs

In early 2014, Wells Fargo promoted an amendment to the City of Minneapolis Sign Ordinance that would permit the roof-top signs that Wells Fargo wanted to install on the Wells Fargo Towers.  (Hanson Decl. ¶ 9, Ex. A.)  MVFS did not oppose the amendment, and on March 28, 2014, the Minneapolis City Council passed it.[3]  (*Id.* ¶¶ 9-10, Ex. A; Doc. No. 12 at 9; Doc. No. 21 at 7.)

On August 8, 2014, Wells Fargo presented MVFS with a document depicting an updated plan for signs on the Wells Fargo Towers, including roof-top signs with illuminated lettering mounted on I-beams (the "Proposed Signage Document").  (Becker Decl. ¶ 16, Ex. 12 ("Proposed Signage Document") at 17-18.)  On August 13, 2014, MVFS sent a letter to Wells Fargo stating its position that the Signage Agreement did not permit the mounted, illuminated roof-top signs shown in the Proposed Signage Document.  (*Id.* ¶ 18, Ex. 13.)  Indeed, internal Wells Fargo emails evidence Wells

---

[3]     The City of Minneapolis Sign Ordinance, as amended, permits "[r]oof signs identifying the name or logo of a building or use, affixed flat on the roof and viewed from above," subject to certain restrictions.  Minneapolis Code of Ordinances § 543.425(c).  It permits roof-top signs that are "non-illuminated or externally illuminated in such a way that the light shall be aimed and shielded directly onto the roof sign only."  *Id.*

Fargo's knowledge of MVFS's objections to its proposed mounted, illuminated signs.

For example, an email from a Wells Fargo employee, dated August 12, 2014, states:

> When we went back to [MVFS] last Friday, we Wells Fargo made it clear in the room that [the Proposed Signage Document] did not deviate from what [was shown in the Master Signage Plan] outside of the ask to illuminate the rooftop signs. [That's] where their leadership then read the contract back to us, advising we could not illuminate the rooftop sign per contractual agreement. We advised that we were asking them to consider this [change to] the contract.

(Coan Decl. ¶ 2, Ex. A ("Ness Dep."), Ex. 3.) A similar email, dated August 14, 2014, states: "As expected, [MVFS representatives] aren't interested in allowing raised / lit lettering on the roof." (Ness Dep., Ex. 12.)

Nonetheless, Wells Fargo submitted its proposed design for mounted, illuminated roof-top signs to the City of Minneapolis, which approved the design without objection. (Hanson Decl. ¶ 11.) Thereafter, in April 2015, Wells Fargo began installing mounted, illuminated roof-top signs on the Wells Fargo Towers. (Doc. No. 24 ("Hailey Decl.") ¶ 3.)

On December 22, 2015, MVFS filed suit against Wells Fargo in Hennepin County District Court, alleging that Wells Fargo breached the Signage Agreement by installing impermissible roof-top signs.[4] (Doc. No. 1, ¶ 1, Ex. A ("Compl.").) The complaint includes two counts: (1) breach of the Signage Agreement; and (2) rescission and declaratory judgment. (Compl. ¶¶ 24-32.) It requests relief including: (1) an injunction

---

[4]     According to MVFS, on December 18, 2015, Wells Fargo's mounted signs were "first visibly demonstrated" to MVFS through a publically-accessible internet "webcam" showing the Stadium's construction over time. (Doc. No. 12 at 14; *see also* Doc. No. 14 ¶ 3, Ex. 2.) Soon thereafter, MVFS filed its lawsuit.

prohibiting Wells Fargo from installing mounted or illuminated roof-top signs on the

Wells Fargo Towers and requiring Wells Fargo to remove any existing mounted or

illuminated roof-top signs; (2) an order rescinding Wells Fargo's rights to place any roof-

top signs (even non-mounted, non-illuminated signs) on the Wells Fargo Towers; and

(3) costs, expenses, and attorneys' fees. (*Id.* ¶¶ a-e.)  It does not seek monetary damages.

(*See id.*)  On December 29, 2015, after Wells Fargo removed the case to this Court,

MVFS filed a motion for preliminary injunctive relief.  (Doc. No. 10.)  On January 28,

2016, the Court denied MVFS's motion and directed the parties to contact the Magistrate

Judge to set an expedited schedule.  (Doc. No. 28.)

　　　Since the Court's denial of MVFS's motion, Wells Fargo has completed

installation of the roof-top signs on the Wells Fargo Towers at a cost of approximately

$490,000.  (Coan Decl. ¶ 3, Ex. B ("Hailey Dep.") at 65; *id.* ¶ 6, Ex. E ("Inspection

Video").)  Each of the two signs includes yellow letters, outlined in black, mounted to I-

beams.  (Hailey Dep. at 51-52; Inspection Video.)  The letters have lights inside of them,

and the lights are capable of shining down on a steel halo backer, which creates a halo

effect around the letters.  (Hailey Dep. at 53-54.)  Each letter is approximately eight feet

tall and five feet wide.  (*Id.* at 56.)  The I-beams are mounted to steel posts that penetrate

the roof.  (*Id.* at 52; *see also* Inspection Video.)  Taking the I-beams, posts, and thickness

of the letters into account, the faces of the letters are approximately 38 inches above the

roof.  (Hailey Dep. at 60-62.)  The background behind the letters is a red square,

measuring 56 feet by 56 feet, that is flat against the roof.  (*See* Inspection Video;

Proposed Signage Plan at 17.)

MVFS representatives, in depositions, claimed that Wells Fargo's mounted, illuminated signs harm the "image" of the Stadium, a unique piece of real property.  As one representative put it, the current signage is "impactful [and] detracts from the image of . . . the broader holistic stadium and district."  (Doc. No. 42 ("Grote Decl.") ¶ 5, Ex. D ("Bagley Dep.") at 159.)  In that representative's view, the Stadium is "going to be a signature element on [the] Minneapolis skyline."  (Bagley Dep. at 164.)  A different representative expressed concern about "all the different ways that a raised sign could be seen differently than a painted-on sign."  (Grote Decl. ¶ 2, Ex. A ("Becker Dep.") at 262.)  A third MVFS representative testified that mounting the roof-top signs "would give the sign[s] a better opportunity [to be seen] from a contiguous building, from an airplane, from a helicopter, from a hang glider, from a drone."  (Grote Decl. ¶ 6, Ex. E ("Warren Dep.") at 177.)  Further, MVFS submitted declaration testimony that television broadcasts of Minnesota Vikings football games have included and will continue to include aerial photography of the Stadium and its surroundings, including the Wells Fargo Towers.  (Doc. No. 16 ("Anderson Decl.") ¶¶ 2-4, Ex. 1.)

Wells Fargo's representatives gave testimony consistent with these statements.  One representative testified that the current roof-top signs "are more visible at night when lit than a flat painted-on sign . . . without lighting" and are more visible after snowfall due to the raised letters.  (Hailey Dep. at 98-102.)  Another explained that the area occupied by the Wells Fargo Towers is "unique because it's got a stadium next door."  (Hanson Dep. at 34-35.)  The same representative also noted that people in planes flying over

downtown Minneapolis, as well as people in other downtown buildings, are in a position

to see Wells Fargo's roof-top signs.  (*Id.* at 25-26.)

In this context, the Court considers the parties' cross-motions for summary

judgment.

## DISCUSSION

### I.        Summary Judgment Standard

Summary judgment is appropriate if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the

light most favorable to the nonmoving party.  *Weitz Co. v. Lloyd's of London*, 574 F.3d

885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the

Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive

determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)

(quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna*

*Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  A party opposing a properly supported

motion for summary judgment "must set forth specific facts showing that there is a

genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see*

*also Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

II.     **MVFS's Breach-of-Contract Claim**

MVFS's primary claim is that Wells Fargo breached the parties' Signage

Agreement by installing roof-top signs that are mounted and illuminated (Count 1).  To

succeed on a breach-of-contract claim, a plaintiff must prove that:  (1) the parties formed

a valid contract; (2) the plaintiff performed any conditions precedent to its right to

demand the defendant's performance under the contract; and (3) the defendant breached

the parties' contract.  *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539,

543 (Minn. 2014).  Here, the parties do not dispute that the Signage Agreement is valid

and enforceable, and they do not dispute that MVFS fulfilled its obligations under the

Signage Agreement.  Further, they do not dispute that Wells Fargo has installed two roof-

top signs with mounted, illuminated letters.

A.      **Interpretation of the Signage Agreement**

The contested issue before the Court is whether Wells Fargo breached the Signage

Agreement, an issue that requires the Court to decide whether the Signage Agreement

permits Wells Fargo's roof-top signs.  Under Minnesota law, a court interpreting a

contract must attempt to determine the intent of the parties from the language of the

contract in light of all of the contract's terms.  *Gorog v. Best Buy Co., Inc.*, 760 F.3d 787,

793 (8th Cir. 2014); *Residential Funding Co., LLC v. Terrace Mortg. Co.*, 725 F.3d 910,

916 (8th Cir. 2013).  If the court determines that the contract language is unambiguous—

meaning it has only one reasonable interpretation—it will give effect to that language.

*Seagate Tech., LLC v. W. Dig. Corp.*, 854 N.W.2d 750, 761 (Minn. 2014).  The

interpretation of an unambiguous contract is a question of law, and the parties' intent

11

"must be determined from the language of the written contract alone." *Winthrop Res. Corp. v. Sabert Corp.*, 567 F. Supp. 2d 1084, 1091 (D. Minn. 2008).  If, however, the court concludes that the contract language is ambiguous, evidence outside the language of the contract, including the circumstances surrounding the contract's formation, is used to determine the parties' intent.  *Metro. Airports Comm'n v. Noble*, 763 N.W.2d 639, 645-46 (Minn. 2009).

The Court begins by examining the language of the Signage Agreement to determine whether it is ambiguous.  Paragraph 1(a) of the Signage Agreement provides a default rule with an exception:  it prohibits Wells Fargo from installing "roof-mounted or roof-applied signs of any kind" *except for* the roof-top signs in the Master Signage Plan, which depicts two 56-foot by 56-foot roof-top signs described as "non-mounted" and "painted."  In short, the default rule prohibits all roof-top signs, and the exception permits only non-mounted signs.  Thus, the Court finds, as a matter of law, that the Signage Agreement unambiguously precludes mounted roof-top signs on the Wells Fargo Towers.

Further, although paragraph 1(a) and the Master Signage Plan are silent about illumination of roof-top signs, the only exception to the general prohibition on roof-top signs is the signs depicted in the Master Signage Plan, which are not described as illuminated.  The absence of any description of the roof-top signs as illuminated is particularly relevant in the context of the Master Signage Plan as a whole.  Other diagrams within the Master Signage Plan expressly address sign illumination.  Diagrams showing signs on the faces of the Wells Fargo Towers specify, "All Lettersets to be internally illuminated yellow with red halo" and "All Banners will incorporate

12

architectural lighting." (Master Signage Plan at D-4, D-5, D-6, D-7; *see also id.* at D-12.)
A diagram depicting monument signs describes each sign as an "Internally Illuminated
Monument." (*Id.* at D-10; *see also id.* at D-11.)  The fact that the Signage Agreement
expressly provides for illumination of these signs, but not of the roof-top signs, supports
the proposition that the parties did not intend to permit illumination of the roof-top signs.
In this context, the Court finds, as a matter of law, that the Signage Agreement
unambiguously prohibits illuminated roof-top signs on the Wells Fargo Towers.[5]

### B.     Wells Fargo's Interpretation of the Signage Agreement

Although the Court finds that the Signage Agreement is unambiguous, it will
briefly address Wells Fargo's two primary arguments regarding interpretation.  First,
Wells Fargo argues that the parties intended the Signage Agreement, including the
Master Signage Plan, as a general guideline, rather than a strict rule.  It points to
paragraph 1(a), which permits roof-top signs of the kind "depicted in terms of image,
location, scale, size (56' x 56') and utility" in the Master Signage Plan.  According to
Wells Fargo, the phrase "in terms of image, location, scale, size (56' x 56') and utility"
reflects the parties' intent to broaden the scope of permissible roof-top signs beyond what
is "depicted" in the Master Signage Plan.

The Court is not persuaded by Wells Fargo's interpretation.  The phrase "in terms
of image, location, scale, size (56' x 56') and utility" serves to clarify the aspects of the
roof-top signs that the Master Signage Plan "depicts."  That is, the Master Signage Plan

---

[5]     Because the Court finds no ambiguity, it does not consider evidence of the
circumstances surrounding the Signage Agreement's negotiation and formation.

depicts the image, location, scale, size, and utility of the roof-top signs, and it does not depict, for example, the precise materials that constitute the roof-top signs.  In addition, the phrase provides context for the clause that follows it, which uses the same language of image, location, scale, size, and utility:  "[R]oof top signs of the same *image* and in the same *location* as the 56' x 56' signs depicted on the Master Signage Plan may be smaller in *size*, *scale* and *utility*."  (Signage Agreement ¶ 1(a) (emphasis added).)  That clause also shows that the parties knew how to provide some flexibility in the parameters for the roof-top signs but chose to do so in a limited way; namely, the size, scale, and utility of signs may be less (but not more) than that depicted in the Master Signage Plan.  The Court is not convinced that the parties intended any additional flexibility with respect to sign parameters.

Wells Fargo's argument is also undermined by text in the Master Signage Plan. The diagram of the roof-top sign states:  "Additional street level signage to be further defined at a later date."  (Master Signage Plan at D-9.)  This language indicates the parties' intent to develop, at a future date, parameters for signs other than the roof-top signs, suggesting that the parties did not intend to further develop parameters for the roof-top signs.  The Court, therefore, rejects Wells Fargo's first contention.

Second, Wells Fargo suggests that its roof-top signs are permissible because they have the same "image" as the roof-top signs in the Master Signage Plan.  In support of this argument, Wells Fargo claims that the word "depicted," in paragraph 1(a), should be read narrowly to refer only to the Master Signage Plan's graphic representation of the roof-top signs, without regard to the text accompanying the graphic representation.  As

14

such, Wells Fargo argues, the current mounted, illuminated roof-top signs are permissible because, when viewed directly from above in daylight, they are similar to the graphic representations of the roof-top signs in the Master Signage Plan.

The Court, again, disagrees. The parties' use of the word "depict" does not permit Wells Fargo to disregard the text included in the diagram of the roof-top signs in the Master Signage Plan. The textual and pictorial elements of diagram are parts of a unified whole, and the Court is convinced that the parties did not intend for either the text or the graphic to be considered without the other. In addition, dictionary definitions of "depict" undercut Wells Fargo's argument. Merriam-Webster offers two definitions of "depict": (1) "to represent by or as if by a picture"; and (2) "describe." *Depict*, Merriam-Webster, www.merriam-webster.com/dictionary/depict (last visited June 20, 2016). Cambridge provides a single definition of "depict": "to represent or show something in a picture, story, movie, etc.; portray." *Depict*, Cambridge Dictionaries Online, dictionary.cambridge.org/us/dictionary/english/depict (last visited June 20, 2016). Taken together, these definitions suggest that the parties used the word "depict" to indicate that the Master Signage Plan represents and describes, both in pictures and words, the roof-top signs that the parties intended to permit as an exception to the general roof-top sign ban. Thus, the words in the diagram of the roof-top signs—including "**Non-Mounted Skyview Graphic** . . . Painted Roof Sign, Custom"—are controlling. As such, the Court rejects Wells Fargo's second argument.

### C.      Breach of the Signage Agreement

Having rejected Wells Fargo's interpretation of the Signage Agreement, the Court

turns to the question of breach.  "A breach of contract is a failure, without legal excuse, to

perform any promise that forms the whole or part of the contract."  *Lyon Fin. Servs.*, 848

N.W.2d at 543.  Here, Wells Fargo promised to refrain from installing mounted,

illuminated roof-top signs on the Wells Fargo Towers and then failed to perform that

promise.  As such, the Court determines, as a matter of law, that Wells Fargo breached

the parties' Signage Agreement.

Wells Fargo argues that it is not liable for breach of contract because any breach

of the Signage Agreement is immaterial.  The Court disagrees.  First, materiality of a

breach is typically relevant in cases where the non-breaching party seeks to rescind or

terminate a contract, not in determining a party's liability for breach of contract.  *See*

*Distronics Corp. v. Roberts-Hamilton Co.*, 575 F. Supp. 275, 277 (D. Minn. 1983);

*Cloverdale Foods of Minn., Inc. v. Pioneer Snacks*, 580 N.W.2d 46, 49 (Minn. Ct. App.

1998); 10-53 Corbin on Contracts § 53.4 (2015) ("For any breach of contract, an action

lies; any breach is material enough for that."); 23 Williston on Contracts § 63:3 (4th ed.)

(updated May 2016) ("[A] nonperforming party is liable for any breach of contract.").

Second, Wells Fargo's breach is in fact material.  "A material breach goes to the

root or essence of the contract."  *BOB Acres, LLC v. Schumacher Farms, LLC*, 797

N.W.2d 723, 728 (Minn. Ct. App. 2011) (quotation marks omitted).  Here, the Signage

Agreement governs the signs that Wells Fargo may install on the Wells Fargo Towers.  It

provides only one narrow exception to its general prohibition of all roof-top signs, and

that exception does not permit mounted, illuminated roof-top signs.  Thus, the Court finds that Wells Fargo's current mounted and illuminated roof-top signs go to the essence of the Signage Agreement and constitute a material breach.

Therefore, because there are no genuine issues of material fact and MVFS is entitled to judgment as a matter of law, the Court grants summary judgment to MVFS with respect to Wells Fargo's liability on Count 1, MVFS's breach-of-contract claim.

### III.    MVFS's Request for Permanent Injunctive Relief

In light of the Court's determination that Wells Fargo is liable for breach of the parties' Signage Agreement, the Court now considers MVFS's request for permanent injunctive relief to remedy Wells Fargo's breach.  As the Supreme Court has explained, a plaintiff must satisfy a four-factor test before a court may grant permanent injunctive relief:  (1) the plaintiff has suffered irreparable injury; (2) legal remedies, such as money damages, are inadequate; (3) an equitable remedy is warranted in light of the balance of hardships between the parties; and (4) a permanent injunction would not disserve the public interest.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)); *see also Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987) (noting that standard for permanent injunction is essentially the same as for preliminary injunction, except that plaintiff must have actual success on the merits).  "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and . . . such discretion must be exercised consistent with traditional principles of equity."  *eBay*, 547 U.S. at 394.

### A.   Permanent Injunction or Specific Performance

As a threshold matter, the Court addresses MVFS's contention that the Court should characterize MVFS's request to order removal of the signs as a request for specific performance of the Signage Agreement, rather than a request for a permanent injunction.  Because MVFS seeks specific performance, MVFS argues, the Court should not require MVFS to satisfy the irreparable-harm factor set forth in the Supreme Court's four-factor test.  The Court disagrees for two reasons.

First, in a contract case like this one, the distinction between specific performance and injunctive relief is not as clear as MVFS suggests.  When a party breaches a contract, a Court may, in certain circumstances, order specific performance of a contract duty or order an injunction against breach of a contract duty.  Restatement (Second) of Contracts § 357 (1981) (updated Mar. 2016).  When the duty at issue is to *refrain* from certain conduct, however, satisfaction of that duty to refrain could be characterized as specific performance of the duty or as an injunction against the prohibited conduct.  *See id.* § 357 cmt. b (explaining that when performance due under a contract consists of forbearance, an injunction directing a party to refrain from doing a specified act effectively orders specific performance).  In addition, the fact that injunctions may be mandatory, as well as prohibitory, undermines any distinction between specific performance and injunctive relief in a contract case.  *See Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984); *Minneapolis Cmty. Dev. Agency v. Itasca Co. (In re Minneapolis Cmty. Dev. Agency of Certain Lands in Minneapolis)*, 403 N.W.2d 310, 313 (Minn. Ct.

App. 1987); 11A Charles Alan Wright et al., Federal Practice & Procedure § 2942 (3d ed.) (updated Apr. 2016).

Perhaps recognizing the difficulty in distinguishing between specific performance and injunctions, courts often characterize requests for specific performance of contract duties as requests for injunctive relief.  *E.g., Apple, Inc. v. Motorola Mobility, Inc.*, Civ. No. 11-178, 2012 WL 5416931, at *2 (W.D. Wisc. Nov. 2, 2012) (explaining that "specific performance is a request for equitable relief in the form of a 'positive injunction,'" and accordingly, "a party requesting specific performance must satisfy the four-factor test" for permanent injunctive relief); *Allan Block Corp. v. E. Dillon & Co.*, 509 F. Supp. 2d 795, 812 n.11 (D. Minn. 2007) (noting that plaintiff's request for an order requiring specific performance of contract "could be considered a request for injunctive relief"); *Minneapolis Cmty. Dev. Agency*, 403 N.W.2d at 313 (treating request for order compelling party to complete construction pursuant to contract as request for mandatory injunctive relief).  Likewise here, where the Court locates no authority requiring it to characterize the relief requested by MVFS as specific performance, the Court treats MVFS's request as one for a permanent injunction subject to the four-factor test.

Second, even if MVFS's request were properly characterized as a request for specific performance, the Court would still have a duty to examine the nature of the injury claimed by MVFS.  Specific performance of a contract—even a contract involving real estate—is not a matter of absolute right, and a court has discretion to determine whether specific performance is warranted after balancing the equities of the case.

19

*Dakota Cty. HRA v. Blackwell*, 602 N.W.2d 243, 244 (Minn. 1999); *BOB Acres*, 797 N.W.2d at 729.

Further, although Minnesota law does not expressly state that a court must find "irreparable injury" before issuing an order for specific performance, one of the factors courts consider in specific performance cases is whether monetary damages provide an adequate remedy, a question closely tied to the question of irreparable injury. *See Maple Secs. U.S.A. Inc. v. Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 862, 876 (Bankr. D. Minn. 2002); *Metro. Sports Facilities Comm'n v. Minn. Twins P'ship*, 638 N.W.2d 214, 227 (Minn. Ct. App. 2002). Indeed, in the context of a claim for injunctive relief, the Eighth Circuit has explained that "[i]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Thus, even if the Court characterized MVFS's request as one for specific performance, rather than injunctive relief, MVFS would still have to show that it suffered a real injury justifying an equitable remedy.

### B.  Irreparable Injury

Having concluded that MVFS's request for relief is one for a permanent injunction to which the Supreme Court's four-factor test applies, the Court turns to the first factor, irreparable injury. In its previous denial of MVFS's request for preliminary injunctive relief, the Court concluded that MVFS did not demonstrate that it would suffer irreparable injury, absent entry of a preliminary injunction, before the Court decided the lawsuit on the merits. Now, the Court has addressed the merits and must decide a related

but different question:  whether MVFS has suffered irreparable injury—or will suffer

irreparable injury in the indefinite future—if the Court declines to grant the permanent

injunctive relief that MVFS requests.  "Possible or speculative harm is not enough" to

justify a permanent injunction.  *Allen v. Minnesota*, 867 F. Supp. 853, 858 (D. Minn.

1994).

In claiming irreparable injury, MVFS asserts that Wells Fargo's current roof-top

signs harm MVFS by tainting the Stadium's "image" as a unique and iconic part of the

Downtown East neighborhood and the Minneapolis skyline.[6]  In particular, MVFS is

concerned that Wells Fargo's mounted, illuminated roof-top signs distract people viewing

the Stadium, whose branding and "image" MVFS has a right to control.  These viewers

include people watching televised events held at the Stadium, whose coverage may

include aerial footage of the Stadium and surrounding area; people in downtown

Minneapolis office towers; and people in aircraft flying over downtown Minneapolis.

In support of its argument, MVFS refers the Court to *K-Mart Corp. v. Oriental

Plaza, Inc.*, 694 F. Supp. 1010 (D.P.R. 1988), which suggests that intangible harm related

to a building's appearance and surroundings may warrant injunctive relief.  In that case, a

landlord breached its contract with a tenant, K-Mart, by constructing retail space in the

parking lot of a shopping center.  *K-Mart*, 694 F. Supp. at 1015.  To remedy the

landlord's breach, the district court issued an injunction requiring the landlord to raze one

---

[6]     Any irreparable injury must result from the fact that the roof-top signs are
mounted and illuminated, rather than painted flat on the roof and unlighted.  That is, the
*difference* between the non-conforming signs currently installed on the Wells Fargo
Towers and the signs depicted in the Master Signage Plan must cause irreparable injury.

21

of the buildings it had constructed, noting that the building injured K-Mart's goodwill by obstructing the public's view of K-Mart's store and interfering with the store's "presence" in the shopping center. *Id.* at 1016-18.

The First Circuit affirmed. *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 916 (1st Cir. 1989). Regarding irreparable harm and inadequacy of damages, it explained: "Real estate has long been thought unique . . . . Then, too, harm to goodwill, like harm to reputation, is the type of harm not readily measurable or fully compensable in damages—and for that reason, more likely to be found 'irreparable.'" *Id.* at 915. It also stressed that the harm suffered by K-Mart would endure for the duration of the lease, which had an initial term of twenty years. *Id.*

With *K-Mart* in mind, the Court evaluates MVFS's claim of irreparable injury. First, harm to the "image" of the Stadium is a cognizable injury. Like interference with the "presence" of K-Mart's store in the shopping center, distraction from the "image" of the Stadium in Downtown East is an intangible harm related to public perception of a building and the brand associated with that building. As the Eighth Circuit has repeatedly recognized, harm related to "intangible assets such as reputation and goodwill can constitute irreparable injury." *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) (quoting *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002)).

Second, the duration of harm to the "image" of the Stadium is significant. Just as the twenty-year lease in *K-Mart* ensured that K-Mart would continue to suffer injury

22

from the landlord's actions for years, the harm inflicted by Wells Fargo's signs—unless the Court intervenes—is likely to extend long into the future.

Third, although MVFS's irreparable injury must stem from the difference between impermissible and permissible signs, the non-conforming features of the current signs are significant. Namely, as explained by witnesses from both parties, mounted, illuminated signs are more visible than flat, unlit signs, especially at night and under light snow. Because they are more visible—and presumably more distracting—the mounted, illuminated signs affect the "image" of the Stadium more than flat, unlit signs would.

Fourth, in paragraph 5 of the Signage Agreement, the parties agreed that installation of non-conforming signs—like Wells Fargo's current roof-top signs—would constitute irreparable injury. As the Court noted in its prior Order, a contractual irreparable-harm provision does not bind the Court, and, without more, is insufficient to establish irreparable injury. *See Legget & Platt, Inc. v. Fleetwood Indus., Inc.*, Civ. No. 15-5064, 2015 WL 4160401, at *3 (W.D. Mo. July 9, 2015); *Allan Block Corp. v. E. Dillon & Co.*, Civ. No. 04-3511, 2005 WL 1593010, at *6 (D. Minn. July 1, 2005). Nonetheless, paragraph 5 shows "that the parties contemplated that a breach of the [Signage Agreement] could cause irreparable harm" and thus lends weight to MVFS's claim. *See Allan Block*, 2005 WL 1593010, at *6.

Considering all of these four reasons, and although the question is close,[7] the Court concludes that MVFS satisfies the irreparable-injury factor.

---

[7] The Court acknowledges that the injury claimed by MVFS is less concrete than that claimed in *K-Mart*, where the landlord's construction blocked K-Mart's sign, and the

### C.      Adequacy of Legal Remedies

The second factor, whether legal remedies—namely, money damages—can remedy MVFS's injury, is closely related to the first factor.  Courts frequently note that irreparable injury occurs when an injured party cannot be fully compensated by money damages.  *See, e.g.*, *Gen. Motors Corp.*, 563 F.3d at 319.  In this case, at the preliminary injunction stage, the Court acknowledged that harm to the Stadium's "image" could not be easily measured in monetary terms.  Now, similarly, the Court finds that the injury caused to the Stadium's "image" by mounting and illuminating the roof-top signs is difficult to quantify.  Indeed, neither party offers any evidence supporting a damages calculation, and paragraph 5 of the Signage Agreement provides the parties' agreement that "money damages would not be an inadequate [sic] remedy" for a violation of the Agreement.  Thus, MVFS has established that legal remedies would be inadequate to compensate MVFS for the injury that mounting and illumination of the roof-top signs would inflict.

### D.      Balance of Harms

Next, the Court considers the third factor, the balance of harms between the parties.  In its denial of MVFS's request for a preliminary injunction, the Court found that the balance of harms favored Wells Fargo, which would have been deprived of all roof-top signage before the Court decided the merits of the case.  Now, however, the Court has found that Wells Fargo is liable for breach of contract and has concluded that Wells

---

district court received expert testimony related to "presence" and its effect on goodwill.  *See K-Mart*, 694 F. Supp. at 1014-15.  Still, taking all facts and argument into account, the Court finds that MVFS has established a concrete injury that justifies injunctive relief.

Fargo's current roof-top signs cause irreparable injury. Requiring Wells Fargo to remove its non-conforming signs is, to be sure, burdensome. The signs cost Wells Fargo approximately $490,000, which would be lost if Wells Fargo were forced to remove the signs. Further, Wells Fargo would bear substantial costs related to use of a construction crane to disassemble and remove the signs. And, it would incur costs related to storage of the disassembled signs, as well as costs related to designing, constructing, and installing replacement signage. Finally, Wells Fargo would be deprived of all roof-top signage from the time the current signs were disassembled until new signage could be installed.

Still, to the extent that Wells Fargo suffers an injury caused by the injunction, such harm would be self-inflicted. *See K-Mart*, 875 F.2d at 916. Wells Fargo knew that MVFS objected to its proposed mounted, illuminated roof-top signs, and in fact, Wells Fargo likely believed that its signs violated the Signage Agreement. Nonetheless, Wells Fargo decided to install the current roof-top signs, a decision that led to the harm of which it now complains. Wells Fargo chose to take this risk. Accordingly, the harm Wells Fargo would suffer in removing the roof-top signs does not outweigh the harm MVFS would suffer if Wells Fargo were permitted to keep the signs. MVFS has established that the balance of harms tips in its favor.

### E. Public Interest

Last, the Court considers the fourth factor, the public interest. In its prior Order, the Court recognized the investment of both parties in the development of Downtown East and concluded that neither the Stadium nor the Wells Fargo Towers took

precedence.  Now, having found Wells Fargo liable for breach of the Signage Agreement, the Court also notes the public interest in "fair dealing and the solemnity of contracts." *See id.*  In the words of the First Circuit in *K-Mart*, "if commerce is to function in our capitalistic system, entrepreneurs must play by the rules."  *Id.*  Indeed, fair business practices promote competition, and they encourage corporate investment in public-private projects like the Stadium and the Wells Fargo Towers.  In these circumstances, MVFS has established that an injunction requiring Wells Fargo to remove its roof-top signs would not disserve the public interest.

In sum, the Court's application of the Supreme Court's four-factor test leads the Court to conclude that MVFS is entitled to a permanent injunction requiring Wells Fargo to remove its current roof-top signs and prohibiting Wells Fargo from installing or maintaining any other mounted or illuminated roof-top signs.

## IV.    MVFS's Claim for Rescission and Declaratory Judgment

In addition to its contract claim and related request for permanent injunctive relief, MVFS asserts a claim for rescission and declaratory judgment (Count 2).  Specifically, MVFS asserts that it "is entitled to an Order rescinding any and all rights to place roof top signage, of any image, location, scale, size or utility, on the Wells Fargo Towers." (Compl. ¶ 32.)  MVFS, however, declines to address this claim in its briefs, leading the Court to conclude that it has abandoned it.  As such, the Court grants summary judgment in favor of Wells Fargo on Count 2.

**V.      MVFS's Claim for Attorneys' Fees and Costs**

Finally, MVFS claims that it is entitled to attorneys' fees and costs.  The Signage

Agreement provides that the "prevailing party" in an action to enforce the Signage

Agreement "shall be entitled to collect all of its reasonable costs of the action, including

reasonable attorneys' fees, from the non-prevailing party."  (Signage Agreement ¶ 5.)

Because the Signage Agreement does not define the term "prevailing party," the Court

looks to Minnesota law for interpretation of this term.  *See DocMagic, Inc. v. Mortg.*

*P'ship of Am., L.L.C.*, 729 F.3d 808, 812 (8th Cir. 2013).  Under Minnesota law, the

"prevailing party in any action is one in whose favor the decision or verdict is rendered

and judgment entered."  *Borchert v. Maloney*, 581 N.W.2d 838, 840 (Minn. 1998).  "A

prevailing party is one who prevails 'on the merits in the underlying action,' not one who

'was successful to some degree.'"  *Elsenpeter v. St. Michael Mall, Inc.*, 794 N.W.2d 667,

673 (Minn. Ct. App. 2011) (quoting *Borchert*, 581 N.W.2d at 840).

Here, MVFS is the prevailing party in this action to enforce the Signage

Agreement against Wells Fargo, the non-prevailing party.  In particular, MVFS has

prevailed on the merits of its breach-of-contract claim—the claim that constituted the

heart of this lawsuit—and it has prevailed on its request for permanent injunctive relief.

Accordingly, under the terms of the Signage Agreement, MVFS is entitled to reasonable

attorneys' fees and costs from Wells Fargo.

## CONCLUSION

Because the Court concludes that the parties' Signage Agreement unambiguously

prohibits the two mounted and illuminated signs currently installed on the roofs of the

Wells Fargo Towers, it rules in favor of MVFS on its breach-of-contract claim, the primary claim in this lawsuit.  In addition, because the Court finds that MVFS has established all four factors of the Supreme Court's four-factor test for permanent injunctions, the Court grants MVFS's request for a permanent injunction.  Specifically, the Court orders Wells Fargo to remove its current roof-top signs and enjoins Wells Fargo from installing or maintaining any other mounted or illuminated signs on the Wells Fargo Towers.  The Court rules in favor of Wells Fargo on MVFS's claim for rescission and declaratory judgment, and it grants MVFS's claim for attorneys' fees and costs.

Notwithstanding the Court's decision, the Court notes that it continues to have difficulty understanding the parties' inability to resolve this dispute short of a court order. The Court is particularly dismayed given the implicit responsibilities imposed on the parties by virtue of their partnerships with state and local governments.  Indeed, the Minnesota legislature enacted the Stadium Legislation—which provides for significant public funding for the Stadium—to serve the state of Minnesota and its citizens.  *See* Minn. Stat. § 473J.01.  Similarly, the City collaborated with Wells Fargo and Ryan on the development of the Wells Fargo Towers, presumably because the City wanted to revitalize Downtown East for the benefit of the public.  In light of these partnerships, each party proclaims its contributions and commitment to the community, yet neither seems to comprehend the possibility that spending vast time and resources on this litigation might disserve the public interest.

Now, having received the Court's decision in this matter, the parties must make a critical decision:  whether to continue to litigate this dispute or to negotiate a resolution.

To that end, the Court reminds the parties that, notwithstanding the Court's Order below, the parties have the power to reach their own compromise solution that would be fair to both parties and fair to the public.[8]

### ORDER

Based on the files, records, and proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1.     MVFS's Motion for Summary Judgment (Doc. No. [44]) is **GRANTED** as to Count 1 and **DENIED** as to Count 2.

2.     Wells Fargo's Motion for Summary Judgment (Doc. No. [39]) is **DENIED** as to Count 1 and **GRANTED** as to Count 2.

3.     MVFS is entitled to a permanent injunction as follows:

a.     Within thirty (30) days of this Order, Wells Fargo must uninstall and remove the two roof-top signs currently installed on the Wells Fargo Towers.

b.     Wells Fargo is prohibited from maintaining or installing roof-top signs that the Signage Agreement prohibits, including, but not limited to, mounted roof-top signs and illuminated roof-top signs.

c.     Prior to installing any roof-top signs on the Wells Fargo Towers, Wells Fargo must meet and confer with MVFS.

4.     MVFS is entitled to its reasonable attorneys' fees and costs incurred in this matter.  MVFS may submit an affidavit and motion for such fees and costs within

---

[8]     For example, MVFS could agree to permit Wells Fargo to maintain its current roof-top signs on the condition that Wells Fargo agrees to disable the illuminating elements of the signs and to forgo Wells Fargo's right to appeal this decision.

fourteen (14) days of this Order.  Wells Fargo may submit a response to MVFS's

affidavit and motion within twenty-one (21) days of this Order.  MVFS shall not file a

reply brief.

### LET JUDGMENT BE ENTERED ACCORDINGLY

Dated:  June 23, 2016                    s/Donovan W. Frank
                                         DONOVAN W. FRANK
                                         United States District Judge